**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**KEVIN VENTURA, ET AL.,**

       **Petitioners,**

    **- against -**

**UNITED STATES OF AMERICA,**

       **Respondent.**
————————————————————————

   **18-cv-9179 (JGK)**
   **20-cv-8064 (JGK)**
   **09-cr-1015 (JGK)**

   <u>MEMORANDUM OPINION AND</u>
   <u>ORDER</u>

**JOHN G. KOELTL, District Judge:**

On December 3, 2013, the petitioner, Kevin Ventura, was convicted after a jury trial of one count relating to the murder of Noel Martinez in April 1995, and four counts relating to the murders of Eugene Garrido and Carlos Penzo in August 1996. On August 12, 2015, Kevin Ventura was sentenced principally to life imprisonment followed by 45 years' imprisonment. <u>See</u> ECF No. 341.[1] The conviction was affirmed by the Second Circuit Court of Appeals on August 10, 2018. <u>See</u> <u>United States v. Ventura</u>, 742 F. App'x 575 (2d Cir. 2018) (summary order).

On July 1, 2015, the petitioner, Jose Ventura, Kevin Ventura's father, was convicted after a jury trial of three counts relating to the murders of Eugene Garrido and Carlos Penzo. <u>See</u> ECF No. 348. On October 2, 2015, Jose Ventura was sentenced principally to a term of life imprisonment. The

———————————————

[1] Unless otherwise noted, all docket citations refer to <u>United States v. Kevin Ventura, et al.</u>, No. 09-cr-1015.

conviction was affirmed by the Second Circuit Court of Appeals on December 15, 2016. See United States v. Lafontaine, 673 F. App'x 81 (2d Cir. 2016) (summary order).

Both petitioners have now moved pursuant to 28 U.S.C. § 2255 to vacate their convictions principally on the grounds of numerous instances of alleged ineffective assistance of trial and appellate counsel in their respective cases. See, e.g., ECF No. 382 (Jose Ventura); ECF No. 417 (Jose Ventura); ECF No. 420 (Kevin Ventura). There is also a claim common to both petitions. Each petitioner relies on an affidavit from Teresa Cruz, a former girlfriend of Jose Ventura, to the effect, that the testimony of two government witnesses at the trials of each of the petitioners was false and a subsequent affidavit in which Teresa Cruz swore that she had told two government agents before the trials of the two petitioners that the testimony of the witnesses was false. See ECF Nos. 431, 443. The Court held an evidentiary hearing on June 29 and 30, 2023, to determine the veracity of the Cruz affidavits. The Court appointed counsel for each of the petitioners and for Ms. Cruz and heard testimony from Ms. Cruz, from a prison inmate who had prepared the affidavits and for whom counsel was also appointed, and from three government representatives who had participated in one or both of the interviews of Ms. Cruz. See ECF No. 454.

Having assessed the credibility of the witnesses and all of

the evidence, the Court makes the following findings of fact and reaches the following conclusions of law with respect to the allegations by Ms. Cruz. The Court also reaches the following conclusions with respect to all of the numerous allegations in the petitions. For the reasons explained below, the motions to vacate the convictions are **denied**.

I.

The Court recounts briefly the extensive record in these cases, only as relevant to the specific claims made in the motions.

### A. Kevin Ventura Trial

On November 17, 2010, an indictment was returned charging Kevin Ventura with five counts relating to the murders of Noel Montanez, Eugene Garrido, and Carlos Penzo. See ECF No. 54. Counts One, Four, and Five charged Kevin Ventura with using a firearm in committing the murders of Noel Montanez, Eugene Garrido, and Carlos Penzo, respectively, and aiding and abetting the same, in violation of 18 U.S.C. §§ 924(j) and 2. Count Two charged Kevin Ventura with conspiring to commit murder-for-hire, which resulted in the shooting deaths of Eugene Garrido and Carlos Penzo, in violation of 18 U.S.C. § 1958. Count Three charged Kevin Ventura with murder-for-hire, which resulted in the shooting deaths of Garrido and Penzo, in violation of 18 U.S.C. §§ 1958 and 2.

Trial began on November 12, 2013. At the trial, there was extensive evidence of Kevin Ventura's involvement in the 1995 murder of Noel Martinez. The evidence showed that in around 1994, Kevin Ventura began to run a marijuana distribution business on Sherman Avenue in northern Manhattan, see, e.g. Kevin Ventura Trial Tr. 378-79, which his father Jose Ismael Ventura, also known as Maelo, had owned and operated for years, see id. 380-81, 385. In the spring of 1995, Kevin Ventura learned that another marijuana business was operating from a 99-cent store a few blocks from Sherman Avenue. See, e.g., id. 502-03.

Kevin Ventura agreed with his friend, Edwin Torrado, who testified as a cooperating Government witness at trial, to burn down the store to shut down the competition. Id. at 588-90. On April 11, 1995, Ventura and Torrado, and other accomplices, including Jorge Lafontaine, who also testified as a cooperating Government witness, went to the 99-cent store. See, e.g., id. 88-90, 504-05, 589-90. Kevin Ventura and Torrado had made firebombs. See id. 437. Both Kevin Ventura and Edwin Torrado carried firearms and wore bullet proof vests. Id. at 334, 593-94, 598, 604. Torrado thought the store clerk – Noel Montanez - was reaching for a gun and Torrado shot Montanez in the shoulder. Id. 599-600. Montanez dropped to the floor and Kevin Ventura set the fire. Id. 600-01. Kevin Ventura and Torrado

4

raced out of the store, calling out to Montanez to leave, but Montanez was dead. Id. at 600-04; Govt App. Br. at 6, United States v. Kevin Ventura, No. 15-2675, ECF No. 105.

At Kevin Ventura's 2013 trial, there was also extensive evidence of his involvement in the murders of Eugene Garrido and Carlos Penzo. Jose Arias de los Santos ("Arias"), the getaway driver for the arson murder of Montanez, testified that he had identified Torrado and Kevin Ventura to the police as responsible for the fire at the 99-cent store. See Kevin Ventura Trial Tr. 248, 357-67. Torrado and Kevin Ventura were subsequently arrested on state charges. While those state charges were pending, Kevin Ventura was released on bail, but his father had to find another person to run the Sherman Avenue marijuana business. Id. 620-622. Jose Ventura turned to Kevin Ventura's cousin, Eugene Garrido, to manage the business in Kevin Ventura's absence. Id. 629. Jose Ventura warned Arias to leave the country. See id. 249-51, 262-63, 264. Arias fled and the charges against Torrado and Kevin Ventura were dismissed in the summer of 1996. But, even after the state charges against Kevin Ventura were dropped, Eugene Garrido continued to act as though the Sherman Avenue business belonged to him. Id. 387-91, 630-32, 953-55. Kevin Ventura and his father determined that Garrido had to be killed. Id. 633-34, 953-60. Nuris Castellanos, who lived on Sherman Avenue, testified at Kevin Ventura's trial

5

that Eugene Garrido wanted to take over the marijuana business on Sherman Avenue. Id. 388. Nuris Castellanos observed a confrontation between Eugene Garrido and Teresa Cruz, Jose Ventura's girlfriend, over Garrido's desire to take over the marijuana business. Id. 388-89. After that confrontation, Nuris Castellanos overheard a conversation between Teresa Cruz and Jose Ventura about taking Eugene Garrido's "life away." Id. 390. After Eugene Garrido was killed, Nuris Castellanos also overheard Teresa Cruz tell Jose Ventura that "[t]he work was done." Id. 390-91.

Two brothers -- Jose and Jorge Lafontaine -- testified at Kevin Ventura's trial that Kevin Ventura offered them $10,000 to kill Eugene Garrido and they accepted the contract. Id. 635-36 (Torrado's testimony), 953-58 (Jorge Lafontaine's testimony), 1093 (Jose Lafontaine's testimony). Kevin Ventura took the brothers on surveillance to show them where Garrido lived. Kevin Ventura provided the gun for the brothers to use and arranged for a rental car for them to drive to and from the murder. Id. 959-62, 1100-02. Kevin Ventura arranged to be in the Dominican Republic on the day of Garrido's murder, but Kevin Ventura selected the time and place for the murder and called the Lafontaine brothers from the Dominican Republic to arrange the details of the murder. Id. 641-43, 962-63.

At the appointed time, the Lafontaine brothers drove to

6

Garrido's apartment building. Id. 963-64, 1103-04. Jose Lafontaine went inside the lobby while Jorge Lafontaine waited outside in the car. When Garrido stepped off the elevator into the lobby, Jose Lafontaine shot Garrido in the head and rushed to the door. But Garrido's friend, Carlos Penzo, was with Garrido, and tried to prevent Jose Lafontaine from leaving. After a struggle, Jose Lafontaine shot Penzo and ran back to the car where his brother was waiting. Both Eugene Garrido and Carlos Penzo died from their gunshot wounds. Id. 872, 876, 963-65, 1104-08, 1086.

Later that same night Teresa Cruz, Jose Ventura's former girlfriend, gave Jorge Lafontaine $2,000 and said, "this is from Maelo." Id. 966, 965-67. "Maelo" is another name by which Jose Ventura was known. Id. 1375. Kevin Ventura subsequently gave Jorge Lafontaine $4,000. Id. 967.

Kevin Ventura testified in his own defense at trial. He acknowledged that around 1994 he began to manage his father's marijuana business at Sherman Avenue. Id. 1374-75. However, Kevin Ventura denied any participation in the arson at the 99-cent store, and any involvement in the murders of Eugene Garrido and Carlos Penzo. Id. 1357-1363. The jury chose to disbelieve Kevin Ventura's testimony and convicted him of all five counts of the indictment against him.

On August 13, 2015, this Court sentenced Kevin Ventura

principally to life imprisonment to be followed by 45 years' imprisonment. See ECF No 341. On August 10, 2018, the Court of Appeals for the Second Circuit affirmed the conviction by summary order. Ventura, 742 F. App'x at 581.

### B. Jose Ventura Trial

Jose Ventura was indicted on November 6, 2013, in a three-count indictment. See ECF No. 154. Count One charged the defendant with conspiring to commit murder-for-hire, resulting in the shooting deaths of Eugene Garrido and Carlos Penzo, in violation of 18 U.S.C. § 1958. Count Two charged the defendant with murder for hire, which resulted in the deaths of Eugene Garrido and Carlos Penzo, in violation of 18 U.S.C. §§ 1958 and 2. Count Three charged the defendant with procuring the intentional killing of Garrido in connection with a conspiracy to distribute 1,000 kilograms and more of marijuana, in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

Trial began on June 15, 2015. There was substantial evidence that Jose Ventura controlled a marijuana distribution business on Sherman Avenue in northern Manhattan. Jose Ventura Trial Tr. 99-100, 228, 281, 637-38. When his nephew and godson, Eugene Garrido, who was running the business in the absence of Kevin Ventura, refused to cede the business, see id. 323-24, 541-44, 641-42, Jose Ventura orchestrated the murder of Garrido, and Carlos Penzo, who was murdered at the same time, see id.

8

551-53. The evidence at trial included the testimony of Edwin Torrado who had firsthand knowledge of the hiring of the hitmen for the murder of Garrido, namely Jorge Lafontaine, who was the driver for his brother, Jose Lafontaine, who was the shooter. Torrado testified that Jose Ventura said that Jose Ventura "wanted Eugene dead . . .." Id. 323. Torrado testified that Kevin Ventura offered Jorge and Jose Lafontaine $10,000 and the forgiveness of a $10,000 debt for killing Eugene Garrido. Id. 327-28.

On August 12, 1996, one week before the murders of Eugene Garrido and Carlos Penzo, Jose Ventura spoke by telephone to Clara Ventura, his sister and Eugene Garrido's mother, who was at her mother's home. Jose Ventura was in the Dominican Republic. Clara Ventura testified that Jose Ventura told her: "[y]ou're better off sending your son to jail because your son is out of control." Id. 646. Clara Ventura responded that she could not do that. Jose Ventura responded that "it's better for you to send him to jail . . . it's better for him to give me my business back because if he doesn't give me my business back, you know what's going to happen to him." Id. Jose Ventura warned Clara Ventura that if she did not send her son to jail, "he was going to have him killed." Id. 646-47.

One week later, on August 19, 1996, Jorge Lafontaine drove Jose Lafontaine to kill Eugene Garrido, and Jose Lafontaine shot

Eugene Garrido and Carlos Penzo. Id. 550-53. Nuris Castellanos testified that, after Garrido was killed, Teresa Cruz had a phone call with Jose Ventura and told him that the "job" was done. Then, as Jorge Lafontaine testified, Cruz called him and said that she had to meet with him. She gave him a cash installment of $2,000 and Jorge Lafontaine testified that she said, "this is from Maelo," or "this is from the dad." Id. 553-554, 608-09, 622-23. A few weeks later, Kevin Ventura delivered another $4,000 payment to Jorge Lafontaine. Id. 554.

Teresa Cruz's friend, Nuris Castellanos, who lived on Sherman Avenue, also testified for the Government. She testified that on one occasion she heard Teresa Cruz talk over the telephone with Jose Ventura about a hostile encounter Cruz had with Eugene Garrido; Teresa Cruz said "[w]hat are we going to do about it"; and Jose Ventura said "[t]ake him out of the way." Id. 237. Nuris Castellanos also testified that after Eugene Garrido was killed, she heard Teresa Cruz "talk [] in code," with Jose Ventura over the phone, which she understood to mean that "Eugene was killed." Id. 238.

On July 1, 2015, the jury found Jose Ventura guilty on all counts. On October 2, 2015, this Court sentenced Jose Ventura principally to a term of life imprisonment. See ECF No. 348. On December 15, 2016, the Court of Appeals for the Second Circuit affirmed the conviction in a summary order. See Lafontaine, 673

10

F. App'x at 85. In the course of affirming the conviction, the Court of Appeals noted that "the government presented a very strong case against Ventura." Id. at 83. The Court also cited the testimony of Clara Ventura and Nuris Castellanos, who had no agreements with the government, and noted that the "evidence of Ventura's guilt was overwhelming." Id. at 84.[2]

## II.

Under 28 U.S.C. § 2255, a federal prisoner "may move the Court which imposed the sentence to vacate, set aside, or correct the sentence" on the grounds that the "sentence was imposed in violation of the Constitution or laws of the United States . . . or is otherwise subject to collateral attack[.]" 28 U.S.C. § 2255(a). On a Section 2255 motion, the defendant bears the burden of proof by a preponderance of the evidence. See Triana v. United States, 205 F.3d 36, 40 (2d Cir. 2000).

Both Jose Ventura and Kevin Ventura argue that they were denied effective assistance of counsel at the trial level because their respective attorneys failed to interview or call prospective witnesses and make various arguments. Their most insistent argument is that their respective counsel were ineffective in failing to interview and call Teresa Cruz who,

---

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

they allege, would have contradicted the trial testimony of
Jorge Lafontaine and Nuris Castellanos and undercut the argument
that Eugene Garrido refused to give up the Sherman Avenue
marijuana business. The Venturas also contend that the
Government must have known of unfavorable evidence from Teresa
Cruz and failed to provide the defendants with that information
in violation of their obligations under Brady v. Maryland, 373
U.S. 83 (1963).

The Government contends that the Venturas' ineffective
assistance of counsel claims are an improper attempt to avoid
procedural default rules, because the Venturas did not raise the
issue of prosecutorial misconduct in their direct appeals. See
ECF No. 416 at 6; ECF No. 447 at 8-10 (citing Dominguez-Gabriel
v. United States, No. 14-CV-3775, 2014 WL 4159981, at *9
(S.D.N.Y. Aug. 21, 2014); Brown v. United States, No. 95-CV-
4368, 1996 WL 479248, at *4 (S.D.N.Y. Aug. 23, 1996)). In any
event, the procedural default rules are not determinative in
this case because the petitioners' claims of ineffective
assistance of counsel and Brady violations fail on the merits.

## A. Ineffective Assistance of Counsel

Criminal defendants have a Sixth Amendment right to the
effective assistance of counsel during all critical stages of a
criminal proceeding. Janvier v. United States, 793 F.2d 449, 451
(2d Cir. 1986). To establish a claim of ineffective assistance

of counsel, a Section 2255 petitioner must show both that: (1) his counsel's performance was deficient in that it was objectively unreasonable under professional standards prevailing at the time, and (2) his counsel's deficient performance was prejudicial to his case. Strickland v. Washington, 466 U.S. 668, 687-91 (1984); Bunkley v. Meachum, 68 F.3d 1518, 1521 (2d Cir. 1995); see also Roy v. United States, 347 F. Supp. 3d 230, 236 (S.D.N.Y. 2018).

To meet the first prong of the Strickland test, the petitioner must establish that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner bears the burden of proving "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." Kimmelman v. Morrison, 477 U.S. 365, 381 (1986). To meet the second prong of the Strickland test, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694.

### B. Brady Violation

A Brady violation requires a new trial where the Government

13

fails to disclose favorable evidence and the undisclosed evidence is material. See United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004); United States v. Viertel, No. 01-CR-571, 2008 WL 1944851, at *1 (S.D.N.Y. April 30, 2008). Evidence is material when "there is a reasonable likelihood that disclosure of the evidence would have affected the outcome of the case, or would have put the case in such a different light as to undermine confidence in the outcome." Rivas, 377 F.3d at 199; see also United States v. Amiel, 95 F.3d 135, 144-45 (2d Cir. 1996). The burden of proving that the Government failed to disclose such evidence lies with the petitioner, and "[c]onclusory allegations that the government 'suppressed' or 'concealed' evidence" are insufficient to satisfy this burden. Harris v. United States, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998) aff'd, 216 F.3d 1072 (2d Cir. 2000).

### C. Teresa Cruz Allegations

In this case, the petitioners submitted two affidavits from Teresa Cruz. The first Affidavit, dated September 22, 2020, makes the following allegations: (1) that Cruz never gave Jorge Lafontaine any money, including $2,000 and did not say "This is for the dad;" (2) that Cruz never had a conversation in front of Nuris Castellanos in which Cruz said that we had to "get Eugene [Garrido] out of the way," nor did Cruz ever have a conversation in which she said, "it was done[;]" and (3) that Victor Garrido,

Eugene Garrido's father, had convinced Eugene Garrido to surrender the drug distribution spot in Manhattan and that Cruz had gone to Victor Garrido's apartment approximately one month before Eugene Garrido's murder and retrieved several drug ledgers and a quantity of prepackaged marijuana. See ECF No. 422, Ex. A.

The second Affidavit from Cruz is dated October 16, 2020 and purports to incorporate by reference the declarations made in the prior affidavit, except when recounting the prior declarations, it states that Cruz went to Eugene Garrido's apartment, rather than Victor Garrido's apartment, to pick up the ledgers and marijuana. See ECF No. 431. The second affidavit also states: "Prior to the trials of Jose and Kevin Ventura, I was interviewed by federal agents on two separate occasions. During these interviews I imparted to the agents the same information contained in my September 22, 2020 affidavit (although I cannot remember whether or not I had admitted to having participated in Jose's marijuana business)." See id.

The credible evidence adduced at the June 29 and June 30, 2023 evidentiary hearing establishes that Cruz was in fact interviewed by government agents on two occasions prior to the trial of Kevin Ventura in November 2013, but that she did not make the statements that she claims to have made to the Government agents. Special Agent Stefano Braccini of the United

States Attorney's Office for the Southern District of New York and Special Agent Lee of Homeland Security Investigations interviewed Cruz at the United States Attorney's Office on October 23, 2013. See Evidentiary Hearing Tr. 189-92, Ventura v. United States, Docket No. 20-cv-8064.

Cruz was appointed counsel and was interviewed a second time on October 29, 2013, where then Assistant United States Attorney Ryan Poscablo led the questioning and Special Agents Braccini and Lee attended. Id. 193. As reflected in the meeting notes, the focus of the interviews was the operation of the Venturas' marijuana business including the amount and cost of drugs, the personnel and mechanics of the block's business, and Eugene Garrido's attempts to take over the spot. See GX 301 & 302.[3] There was also a reference in the second interview that Josefina Ventura told Cruz that Eugene Garrido had been killed. There are additionally substantial references to Cruz's participation in the marijuana business. But there are no indications in the notes that Cruz was asked about the three sets of incidents which she claimed in her first affidavit to have occurred and which she claimed in her second affidavit to

---

[3] In connection with its opposition briefing, the Government submitted, under seal and ex parte, the handwritten notes from its meetings with Cruz in October 2013 to the Court for in camera review. See ECF No. 26 at 3, Case No. 20-cv-8064. The notes were also made available to counsel for the petitioners in connection with the evidentiary hearing. See GX 301, GX 302.

have told the Government about prior to the Venturas' trials.
There is no indication in the notes, see GX 301-302, that she
told the agents that she did not give Jorge Lafontaine $2,000
from Maelo, and each of the Government witnesses denied that
Cruz told them any such thing. See Evidentiary Hearing Tr. 197-
198, 317-18, 353-54.

Similarly, there is no indication in the notes of the meetings
with Cruz that Cruz told the Government that she did not say
what Nuris Castellanos attributed to Cruz about conversations
between Cruz and Jose Ventura, namely the need to get Eugene
Garrido out of the way and the fact that the deed "was done,"
and the Government witnesses denied that Cruz made such
statements. See id. 202-04, 320-21, 354-55. Nor is there any
reference in the notes of the Cruz interviews to Cruz's picking
up drug ledgers or to Eugene's surrender of the marijuana spot
approximately one month before his death.[4] Then Assistant United

---

[4] Following the evidentiary hearing, the Court gave the parties
the opportunity to submit briefs and reply briefs, which all the
parties did. See ECF Nos. 35, 36, 39, Ventura v. United States,
Case No. 20-cv-8064. After that briefing was completed, the
petitioners filed a joint pro se brief. See ECF No. 43. Although
unauthorized, the Court has considered that brief which re-
argues many of the petitioners' contentions. Nothing about that
brief alters the Court's conclusions. The one item that deserves
note is that the petitioners for the first time attempted to
analyze the drug records found in Eugene Garrido's apartment.
See id. at 11-14; see G. Ex. 401. They argue that these records
reflect that Eugene Garrido was involved in drug operations such
as the sale of cocaine, which were unrelated to the marijuana
operation on Sherman Avenue, all of which is irrelevant to the

States Attorney Poscablo and each of the Government Agents present – Braccini and Lee - deny that any such statements were made. See id. 208, 324, 355-56.

Although the Government expected to have additional meetings with Cruz after the October 2013 meetings, Cruz entered a psychiatric institution following the second interview and declined additional contact with the Government. See id. 194, 315-16.

The Government did not have contact with Cruz again until 2020 after the Cruz affidavits were submitted. Special Agent Braccini testified that he visited the home of Cruz's sister then, and spoke with Cruz over the phone. Id. 220. Braccini asked about the affidavits and Cruz stated that she had received the affidavits from Jose Ventura and he had told her to sign them and return them. She said that she had no idea what was in the

---

issues raised at the evidentiary hearing. The Government had argued that the records showed that Eugene Garrido was in fact involved in the marijuana business up to the time of his death. The petitioners argue that the records the Government pointed to, which allegedly reflected activity at the Sherman Avenue location as late as August 19, 1996, the date of Eugene Garrido's murder, were not, as Agent Braccini testified, see Evidentiary Hearing Tr. 213, records from the Sherman Avenue spot because they included sales of $10 packages of marijuana and because the records were kept in a spiral notebook rather than on brown bags in the usual fashion for the Sherman Avenue spot. There is no dispute that the records were recovered from Eugene Garrido's apartment, see id. 211-12, but because the record is not developed as to which, if any records, relate specifically to the Sherman Avenue location, the Court has not relied on them.

affidavits and did not read them. Id. 222.

    The petitioners offered the testimony of Scott Barbour and
Teresa Cruz at the hearing. Barbour is a federal inmate
presently serving a thirty-five-year sentence for narcotics
offenses with a tentative release date of December 2031. See id.
39-40. Barbour had previously been convicted of telemarketing
fraud related to defrauding victims, including elderly victims.
Id. 84. While on supervised release from that fraud conviction,
Barbour absconded and assumed a fake identity. At his sentencing
for the narcotics offense, Barbour received an obstruction of
justice enhancement for his attempts to change testimony,
prevent testimony, threats, and intimidation. Id. 87.

    Barbour worked on the Venturas' petitions beginning in or
about January 2019. Id. 40-41. He drafted the two Cruz
affidavits. Id. 46. He claimed that he spoke with Cruz by phone
on three occasions after being directed to speak with her by
Jose Ventura. He then sent the first affidavit to her on or
about August 24, 2020. Id. 47-49, 65-66. Barbour received the
affidavit back from Cruz, and followed up with a subsequent
conversation with Cruz, which was the basis for the second
affidavit, which Cruz signed at the end of October 2020. Id. 51-
53, 56, 74-76.

    At the time that Barbour drafted the affidavits he had
reviewed the Kevin and Jose Ventura trial transcripts, see id.

19

61, but did not have access to the notes from Cruz's meetings
with the Government, see id. 77. It is plain that the affidavits
were drafted to have Cruz deny specific aspects of the trial
testimony that had been attributed to her and add the allegation
that she picked up drug records and marijuana from Victor
Garrido or Eugene Garrido a month before Eugene Garrido's
murder, thus removing the alleged motive for Eugene Garrido's
murder. The affidavits were drafted in such a way to rebut trial
testimony although Cruz could not have known at the time of her
interviews with the government agents what the trial testimony
would be because the trials had not yet occurred. Hence, in her
first affidavit she alleges what "Nuris Castellanos apparently
testified" to, and in the second affidavit, she swore that
"[p]rior to the trials of Jose and Kevin Ventura, I was
interviewed by federal agents on two separate occasions. During
those interviews, I imparted to the agents the same information
contained in my September 22, 2020 affidavit (although I cannot
remember whether or not I had admitted to having participated in
Jose's marijuana business.)" ECF No. 431; G Ex 103, 104. Based
on all of the evidence, Barbour's testimony was not credible
when he testified that the affidavits were based on what Cruz
told him rather than on his construction of what would be useful
for purposes of the petitions.

Teresa Cruz also testified. According to Cruz, in

20

approximately 2020, she learned from Jose Ventura's cousin that Cruz had been implicated in giving Jorge Lafontaine money for the Garrido and Penzo murders. Evidentiary Hearing Tr. 101-02. Cruz then began communicating with Jose Ventura and Barbour. Id. 101-04. Barbour then allegedly sent papers to Cruz to sign which she read and signed in front of a notary. After she had mailed the papers, Barbour sent another affidavit which she allegedly read and signed before a notary. Id. 105-06, 108-09.

Although Cruz generally stood by the allegations in her affidavits, her answers were sometimes couched with qualifications like: "If I am not mistaken," and "in my heart I did think . . .." See, e.g., id. 148-51, 157-59, 173. Ultimately, she could not recall who at which meeting asked her whether she gave money to anyone and that she then denied doing so. Id. 173.

Similarly, although she testified in her first affidavit that she did not have a certain conversation with Nuris Castellanos, and that she did not overhear a conversation between Nuris Castellanos and Jose Ventura, and reaffirmed those statements in her second affidavit and alleged that she confirmed those facts to the Government before the Ventura trials, and testified to the same effect at the evidentiary hearing, see id. 111, she conceded on cross examination that she did not convey that information to the Government in the 2013

21

meetings and that her second affidavit was incorrect in that respect, id. 162-63.

There are other reasons to reject the veracity of the Cruz affidavits. In the first affidavit, Teresa Cruz swore that she retrieved the drug records from Victor Garrido's apartment. See ECF No. 422, Ex. A. In the second affidavit, Cruz swore that she retrieved the records from Eugene Garrido's apartment. See ECF No. 431. Barbour testified that the reference was a typo and should have said Victor Garrido's apartment. See Evidentiary Hearing Tr. 55. But Cruz testified that she reviewed both affidavits before signing them and that they were truthful. Id. 143. And the reference to retrieving the drug ledgers from Eugene Garrido was not truthful according to Cruz's own testimony. Similarly, in the second affidavit, Cruz swore that when she spoke to the government agents prior to the trials of the Venturas, in which she imparted the information contained in her first affidavit, she "cannot remember whether or not [she] had admitted to having participated in Jose's marijuana business." ECF No. 431. That statement was implausible at best because a significant part of both interviews, as reflected in the interview notes, was about Cruz's participation in the marijuana business. Barbour again took responsibility for that statement, see Evidentiary Hearing Tr. 56, allegedly based on Cruz's efforts to minimize her participation in the marijuana

22

business, id. 74-76. But, Cruz testified that she reviewed the affidavit and it was true. However, that statement in the affidavit was not true because she admitted her substantial role in the marijuana business to the Government.

The petitioners argue that it is unreasonable to believe that the Government did not ask Cruz about the specific items that she claims to have told the Government. The petitioners contend that the Government witnesses, particularly Agent Braccini, are not to be believed.[5] But the testimony by the Government witnesses was credible. At the time of the interviews, before the trial of Kevin Ventura, Jose Ventura had not yet been indicted and it was unclear whether Teresa Cruz would be charged in that indictment and whether she would be

---

[5] Special Agent Braccini has worked for the United States Attorney's Office for fourteen years as an investigator. Prior to joining the United States Attorney's Office, Agent Braccini was with the New York City Police Department from which he retired with the rank of first grade Detective after spending eleven years in the cold case squad. The petitioners point out that Special Agent Braccini was the subject of one adverse credibility finding in People v. Kenneth Felder, No. 22/2000, 2001 WL 914115 (N.Y. Sup. Ct. May 16, 2001), in which the trial court found that Detective Braccini's testimony that he did not contact an attorney for a suspect because Detective Braccini assumed that the attorney was only representing the suspect on another matter was not credible and was "tailored to nullify constitutional objections." Id. at *1. The Court has taken that decision into account but has concluded that Detective Braccini's testimony in this case is credible and amply supported by the testimony of other witnesses and evidence and contradicted only by the testimony of witnesses whose testimony is not credible.

called as a defense witness in either trial. <u>See</u> Evidentiary Hearing Tr. 185. Therefore, the agents asked open-ended questions of Ms. Cruz and did not confront her with specific statements of other witnesses. <u>Id.</u> at 186-89. Indeed, it would have been odd to ask questions of Cruz about what she did not do, rather than what she did. Asking such negative questions would have possibly disclosed the testimony of other witnesses. <u>Id.</u> at 188-89. In any event, the testimony of the Government witnesses was credible and conformed to the contemporaneous notes of the interviews.

Moreover, the testimony of the Government witnesses is also consistent with the sworn trial testimony of Jorge Lafontaine and Nuris Castellanos that was credited by two juries. The testimony by Teresa Cruz and Scot Barbour at the evidentiary hearing was not credible, and both affidavits by Teresa Cruz were not credible. Therefore, these submissions do not support the petitioners' allegations that the failure to call Teresa Cruz as a witness was ineffective assistance of counsel or that the Government withheld any <u>Brady</u> material from the petitioners in either case.

### D. Remaining Claims by Jose Ventura

The remaining claims alleging ineffective assistance of counsel are likewise without merit. Both Jose Ventura and Kevin Ventura raise a plethora of additional claims against their

24

trial and appellate counsel. None of these claims individually or in combination rise to the level of ineffective assistance such that counsel was not functioning as counsel guaranteed by the Sixth Amendment. See Strickland, 466 U.S. at 687. Moreover, the evidence in both cases was powerful and the petitioners have failed to show that if counsel had done all of the things that counsel allegedly should have done, the result of the proceedings would have been different. See id. at 691-94. We deal first with the remaining claims by Jose Ventura.

**1.**

In his initial habeas petition, Jose Ventura alleges that his trial counsel provided ineffective assistance for failing to investigate or present an alibi defense at trial and that his appellate counsel was ineffective for failing to raise the alleged ineffectiveness of trial counsel on direct appeal or in his petition for a writ of certiorari. See ECF No. 382. Jose Ventura's allegation that his trial counsel was ineffective for his failure to investigate or present this alibi defense cannot satisfy either Strickland prong. It is well established that "[a]ctions or omissions by counsel that might be considered sound trial strategy do not constitute ineffective assistance." Henry v. Poole, 409 F.3d 48, 63 (2d Cir. 2005). And, Jose Ventura fails to present any factual argument that his trial counsel's decision not to investigate or to pursue an alibi

defense resulted from anything other than his counsel's professional judgment.

Jose Ventura contends that he was in the Dominican Republic from August 5, 1996—June 30, 2006. See ECF NO. 382 at 5. But the jury charge makes clear that Jose Ventura did not need to be in the same physical location as the murders, see, e.g., Jose Ventura Trial Tr. 875-76, and Jose Ventura failed to show any prejudice as a result of his counsel's decision not to present this alleged alibi. There was no dispute at trial that Jose Ventura was in the Dominican Republic at about the time of the murders of Eugene Garrido and Carlos Penzo. Clara Ventura testified that Jose Ventura was in the Dominican Republic the week before the murders of Eugene Garrido and Carlos Penzo when Jose Ventura threatened the murder of Eugene Garrido over the phone. Id. at 646-47. Jose Ventura's physical location was not relevant to his guilt for the charged offenses. Jose Ventura was charged and convicted for conspiracy to commit murder, murder-for-hire, and murder while engaged in a continuing criminal enterprise. ECF No. 348. The jury convicted Jose Ventura for organizing these murders irrespective of his physical location.

**2.**

In his amended petition, Jose Ventura alleges that his trial counsel provided ineffective assistance of counsel in a host of different ways, none of which individually or in

combination could meet the Strickland standard. More
particularly, Jose Ventura alleges his counsel erred by (a)
failing to object to the prosecutor's alleged misconduct; (b)
failing to investigate and prepare for trial adequately; (c)
failing to object to the admission of hearsay testimony; (d)
failing to interview potential defense witnesses; (e) failing to
object to the jury charge; and (f) failing to move for the
admission of Eugene Garrido's "death prediction" letter. In
addition, Jose Ventura alleges (g) that his appellate counsel
provided ineffective assistance of counsel by failing to raise
the six issues enumerated above on direct appeal and by failing
to advance a sufficiency of the evidence argument on direct
appeal. See ECF No. 413. For the reasons that follow, each of
Jose Ventura's claims lack merit.

**a.**

Regarding Jose Ventura's claims of prosecutorial
misconduct, Jose Ventura asserts that the Government (i)
improperly withheld evidence; (ii) failed to correct perjured
testimony and elicited false testimony; (iii) asked leading
questions; (iv) misstated the evidence; (v) shifted the burden
of proof to the defendant; and (vi) misrepresented the scope of
the cooperation agreements. See ECF No. 413 at 25-50. Jose
Ventura alleges that his conviction must be vacated "based on
all of the examples of prosecutorial misconduct cited above[.]"

Id. at 50. And, Jose Ventura contends that his trial counsel
provided ineffective assistance by failing to object to the
Government's conduct.

As an initial matter – with the exception of Jose Ventura's
claims of ineffective assistance of counsel - Jose Ventura is
procedurally defaulted from raising claims in a § 2255
proceeding that could have been raised on direct review but were
not, including claims of prosecutorial misconduct. See United
States v. Frady, 456 U.S. 152, 167-68 (1982). On direct appeal,
Jose Ventura raised two claims – first that the district court
improperly admitted prejudicial evidence of an uncharged murder
(namely the murder of Noel Montanez), and second that the
district court erred by removing a juror during deliberations.
See LaFontaine, 673 F. App'x at 83. Jose Ventura did not appeal
any alleged Brady violation, raise any objection under the
Confrontation Clause, nor claim that the Government misstated
the evidence at trial. Although Jose Ventura is not procedurally
defaulted from raising ineffective assistance of counsel claims
on collateral review that were not raised on direct appeal, see
Massaro v. United States, 538 U.S. 500, 508-09 (2003), Ventura's
attempt to "recast his substantive arguments . . . in terms of
ineffective assistance of counsel is unavailing." See Roberts v.
United States, No. 13-CV-653, 2018 WL 1582288, at *3 (E.D.N.Y.
March 30, 2018) (quoting Brown, No. 95-CV-4368, 1996 WL 479248,

28

at *4).

**i.**

In any event, Jose Ventura's claims of prosecutorial
misconduct fail on the merits. Jose Ventura alleges that the
Government committed a <u>Brady</u> violation by withholding material
evidence of a stipulation entered in Kevin Ventura's trial
regarding the Enterprise rental car that was used in the murders
of Eugene Garrido and Carlos Penzo. <u>See</u> ECF No. 413 at 27-28.
According to the stipulation, Kevin Ventura's name did not
appear on the car's rental history and Jose Ventura contends
that this stipulation contradicts Jorge Lafontaine's testimony
that Kevin Ventura had rented the car. <u>See</u> Jose Ventura Trial
Tr. 548. Jose Ventura contends that the Government had a duty to
disclose the stipulation to Jose Ventura's defense counsel. <u>See</u>
ECF No. 413 at 28. Jose Ventura also alleges that the Government
had a duty to disclose the stipulation entered at Kevin
Ventura's trial regarding NYPD Detective Armando Baquero's
interview of Clara Ventura, which stated the Clara Ventura
Garrido did not identify any person responsible for Eugene
Garrido's death. <u>See</u> ECF No. 413-1. Jose Ventura argues that
this stipulation contradicted Clara Ventura's testimony and
should have been turned over to the defense. <u>See</u> ECF No. 413 at
29.

Both stipulations, however, were part of the publicly

available trial record of Kevin Ventura's trial, and no
violation occurs where the defendant knew or should have known
of the existence of the evidence. See Tate v. Wood, 963 F.2d 20,
25 (2d Cir. 1992) ("The rationale underlying Brady is not to
supply a defendant with all the evidence in the Government's
possession which might conceivably assist the preparation of his
defense, but to assure that the defendant will not be denied
access to exculpatory evidence only known to the Government.")
(emphasis in original). Therefore, there was no prosecutorial
misconduct related to the stipulations entered at Kevin
Ventura's trial.

Moreover, the failure by counsel to rely on either of these
items could not have prejudiced Jose Ventura. As explained
below, there was evidence at Kevin Ventura's trial about Kevin
Ventura's connection to the Enterprise car rental. And, Clara
Ventura's testimony about her conversation with Jose Ventura was
clear at both the trials of Kevin Ventura and Jose Ventura.

Next, Jose Ventura contends that the Government engaged in
misconduct by failing to produce a letter written by Eugene
Garrido ("Garrido Letter"), that was discovered by the NYPD
following a search of Eugene Garrido's apartment after his
murder. See ECF No. 413 at 30-31. The Garrido Letter predicts
Garrido's death and identifies the names of the people who will
have murdered him. But the Government produced this letter in

its February 11, 2014 discovery production, which Jose Ventura
attached to his habeas petition with the Bates Stamp, "EG000037-
41," from the Government's discovery production. See ECF No.
413, Exhibit D at 87-93. Because the Government produced this
letter in discovery, Jose Ventura's claim of misconduct
regarding the Government's alleged withholding of this letter
fails. Moreover, Eugene Garrido's speculation as to who had a
motive to kill him in no way undercuts the evidence that Jose
Lafontaine in fact killed him, and that the Lafontaine brothers
were hired by Jose and Kevin Ventura.

Finally, Jose Ventura contends that the Government failed
to disclose travel documents indicating that Jose Ventura was in
the Dominican Republic in August of 1996. See ECF No. 413 at 31-
32. But the Government admitted into evidence the passport
applications of Kevin Ventura and Edwin Torrado, see Jose
Ventura Trial Tr. 330-32, and the Government represents that
these documents were the only "travel documents" in the
Government's possession, see ECF No. 416 n.8. Indeed, Jose
Ventura acknowledges that he does not have "dispositive proof"
that the Government had his travel documents. See ECF No. 413 at
31. There can be no prosecutorial misconduct when the Government
never possessed documents that the Government was alleged to
have withheld. Moreover, the fact that Jose Ventura was in the
Dominican Republic for substantial periods while the Garrido

31

murder was planned and carried out was not disputed and did not prevent his involvement in that murder.

### ii.

Jose Ventura contends that the government elicited false testimony and sponsored perjurious testimony. See ECF No. 413 at 39-42. Specifically, Jose Ventura argues that the "lion's share" of the testimony provided by Clara Ventura and "cooperating witnesses" was untrue. Id. at 40. But, Jose Ventura cites only three examples he claims to be untrue: First, Jose Ventura cites Jorge Lafontaine's testimony that Kevin Ventura had rented the vehicle used in the murders of Eugene Garrido and Carlos Penzo, while the Government knew that Kevin Ventura was in the Dominican Republic at the relevant time, and that instead, Jorge Lafontaine and Claudia Amanini had rented the vehicle (not Kevin Ventura). See id. at 40-41. Second, Jose Ventura contends that Jorge Lafontaine testified falsely that he saw Jose Ventura on a sidewalk in New York after the murder and that Jose Ventura had said that Kevin Ventura and Edwin Torrado "didn't have the balls" to kill Eugene Garrido, but that the Government knew Jose Ventura was in the Dominican Republic at the time. See id. at 40-41 (quoting Jose Ventura Trial Tr. 554-55). And, third that Jorge Lafontaine testified falsely that Kevin Ventura had given him $4,000 a few weeks after the murders, but that Kevin Ventura was in the Dominican Republic during this time. See ECF No. 413

at 41.

Jose Ventura has failed to show that any of this testimony
was knowingly false as to a material matter. <u>See</u> <u>United States</u>
<u>v. Dunnigan</u>, 507 U.S. 87, 94-95 (1993) (recognizing that perjury
is the giving of "false testimony concerning a material matter
with the willful intent to provide false testimony, rather than
as a result of confusion, mistake, or faulty memory."). Jorge
Lafontaine's testimony that Kevin Ventura rented the vehicle and
gave him a payment "a few weeks after" the murders may be
imprecise, but there is credible testimony that Kevin Ventura
was involved in the car rental transaction, even if he was not
physically present, because he was the person who knew the
rental car agent and received a discount from that person. <u>See</u>
Jose Ventura Trial Tr. 85-86, 548-49. Jose Ventura's challenge
to Jorge Lafontaine's testimony about the timing of the $4,000
payment by Kevin Ventura is based on Kevin Ventura's absence
from New York at that time, but the government freely conceded
in its opening statement that Kevin Ventura was in the Dominican
Republic at the time of the Garrido and Penzo murders and
orchestrated them from there. <u>See</u> Jose Ventura Trial Tr. at 50.
That did not prevent Kevin Ventura from returning from the
Dominican Republic after the murders. The timing of the payment
was not significant, particularly when Jorge Lafontaine's trial
testimony about the receipt of money from Kevin Ventura was

33

consistent over two trials and related to events that occurred almost twenty years before his testimony. Compare Jose Ventura Trial Tr. 553-555, with Kevin Ventura Trial Tr. 965-67. There is no basis to conclude that this testimony was false. See United States v. Monteleone, 257 F.3d 210, 219-220 (2d Cir. 2001) (recognizing that "[s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury.").[6] Moreover, there is no showing of ineffective assistance of counsel with respect to any of these three incidents. There is no showing that counsel could have excluded the testimony and no showing that the result of the trial would have been different without that testimony in view of the strong evidence against Jose Ventura. See Bennett v. United States, 663 F.3d 71, 87-88 (2d Cir. 2011).

### iii.

Jose Ventura alleges that the Government committed misconduct by asking leading questions, and that his counsel's failure to object rises to the level of constitutional deficiency. See ECF No. 413 at 42-45. Jose Ventura identifies

---

[6] Similarly, the only basis for Jose Ventura's challenge to Jorge Lafontaine's testimony that Jose Ventura made a comment to him in New York after the Garrido and Penzo murders is his allegation that he was in the Dominican Republic at the time of the murders. But that did not prevent Jose Ventura's return to New York, and there is no evidence proffered that Jorge Lafontaine testified falsely about his encounter with Jose Ventura.

ten examples in a lengthy transcript that he claims is "riddled with leading questions." See id. at 44. But, decisions made by counsel about whether and when to object are a matter of strategy and tactics, and failure to object does not necessarily evidence deficient performance. See United States v. Cohen, 427 F.3d 164, 170 (2d Cir. 2005). Indeed, failure to object to a leading question may be "evidently tactical," and an "attorney might choose not to object to some leading questions for several colorable reasons, including a desire not to appear obstructionist." See Flores v. Keane, 211 F. Supp. 2d 426, 441 (S.D.N.Y. 2011). There is no showing that the failure to object to some questions as leading was ineffective assistance of counsel or prejudiced Jose Ventura in any way.

### iv.

Jose Ventura further claims that the Government engaged in misconduct by misstating the evidence, and that his trial counsel provided deficient representation by failing to object to the Government's misconduct. See ECF No. 413 at 45-46.

For example, Jose Ventura contends that Government made the following alleged misrepresentations: that the Government stated in summation: "[Nuris Castellanos] told you [the jury] about how Maelo and Ventura and Teresa began discussing taking Eugene Garrido out." See ECF No. 413 at 45-46 (quoting Jose Ventura Trial Tr. 785). Jose Ventura argues that Nuris Castellano

35

actually testified that she heard Jose Ventura and Teresea Cruz discuss that they would "take [Eugene Garrido] out of the way[,]" see ECF No. 413 at 45 (quoting Jose Ventura Trial Tr. 237), not that they would be "taking [Eugene Garrido] out[,]" see ECF No. 413 at 45-56 (quoting Jose Ventura Trial Tr. 785). Jose Ventura alleges that there is a substantial difference between "taking someone out" and "taking someone out of the way," and therefore that the Government misstated the evidence. See ECF No. 413 at 45-46.

Jose Ventura also argues that the Government made the following inaccurate statement in the rebuttal summation: "Again [Edwin Torrado] testified very clearly that from the beginning of his cooperation he told the government that Maelo Ventura was the boss of the spot, that he authorized everything that happened there, that he ordered the murder of Eugene and authorized the payment for it[.]" See id. at 46 (quoting Jose Ventura Trial Tr. 844-45). But Jose Ventura alleges that the Government mischaracterized Torrado's testimony and that Torrado in fact testified: "If I was asked that question, I would have answered that [Jose Ventura] was the person who made the ultimate decision. I wasn't asked that question." Jose Ventura Trial Tr. 475. Jose Ventura alleges that the Government misconstrued Torrado's testimony by restating Torrado's affirmative answer to a question that Torrado claims he was

never asked.

For each of Jose Ventura's arguments, Jose Ventura relies on his trial counsel's failure to object to the Government's statements in summation or rebuttal summation to support his argument that his trial counsel failed to object to alleged prosecutorial misconduct. See ECF No. 413 at 45-51. But counsel's statements in jury addresses are not evidence, and a lack of defense objections during the Government's summation does not mean that counsel's performance fell below an objective standard of reasonableness. See Cuevas v. Henderson, 801 F.2d 586, 592 (2d Cir. 1986); United States v. Daniels, 558 F.2d 122, 127 (2d Cir. 1977). Moreover, the Second Circuit Court of Appeals found that in this case the Government had "presented a very strong case" and the evidence of Jose Ventura's guilt was "overwhelming." Lafontaine, 673 F. App'x at 83-84. And, this Court specifically advised the jury that comments made by counsel are not evidence. See Jose Ventura Trial Tr. 33-34. Jose Ventura has made no showing that the Government's characterizations were misleading or that they prejudiced the defendant. See Strickland, 466 U.S. at 691-92.

Jose Ventura provides one example of alleged misconduct from outside the Government's summation and rebuttal summation. Jose Ventura refers to the direct examination of Jorge Lafontaine, when the Government asked: "During the time that you

37

were working at the marijuana spot, did you ever hear [Kevin Ventura] talking about the fact that other people were not allowed to sell marijuana in that neighborhood?" ECF No. 413 at 50-51 (citing Jose Ventura Trial Tr. 525). Jose Ventura alleges that it had not been "established as a <u>fact</u> that other people were not allowed to sell marijuana in that neighborhood." ECF No. 413 at 51 (emphasis in original). But it was not improper for the Government to ask Jorge Lafontaine whether Kevin Ventura ever discussed "that fact," particularly given the strong evidence that Kevin Ventura engaged in the arson of a rival marijuana seller's business. <u>See, e.g.,</u> Jose Ventura Trial Tr. 298-99, 303, 351-52.

**v.**

Jose Ventura contends that his trial counsel failed to object to the Government's statements that impermissibly shifted the burden of proof to the defendant. <u>See</u> ECF No. 413 at 47-48. Jose Ventura refers to the following comments made during the Government's rebuttal summation:

> There is not a shred of evidence in this trial that Maelo Ventura's marijuana business shut down after Eugene's death, not a bit. . . [t]here's no evidence that the business shut down, that he stopped being involved in it, that the money stopped rolling in once Eugene was killed.

<u>Id.</u> at 47 (citing Jose Ventura Trial Tr. 836).

> [A]nd I think you can tell from your own experience in his trial and what's happened during it that if there was one shred of evidence anywhere that Edwin Torrado or any other

38

witness had ever said anything that someone else was the
boss of the spot, that someone else ordered Eugene to be
killed, that someone else authorized the release of that
money that you would have heard about it in this trial. And
there's nothing, nothing to support that theory, nothing.

Id. at 47 (citing Jose Ventura Trial Tr. 845).

And, "[M]aybe there's some other mysterious killer out
there and [Jose Ventura] had nothing to do with it. There's
no evidence of that at all."

Id. at 47-48 (citing Jose Ventura Trial Tr. 848).

Jose Ventura argues that these comments constitute
impermissible burden shifting and that even if his counsel had
objected and there had been curative instructions, the
instructions would have unlikely had any measurably mitigating
effect due to the cumulative effect of the Government's numerous
alleged prejudicial remarks in summation. See ECF No. 413 at 48
(citing Floyd v. Meachum, 907 F.2d 347, 353 (2d Cir. 1990)).
But, these comments were made during the Government's rebuttal
summation, and "[i]n summation, the government may respond to
defense counsel's arguments and refocus the jury on 'the
evidence and away from defense counsel's claims.'" United States
v. Hilts, 757 F. App'x 56, 60 (2d Cir. 2018) (summary order)
(citing United States v. Rivera, 971 F.2d 876, 883 (2d Cir.
1992)). Each of the Government's comments addresses Jose
Ventura's theory that someone else was responsible for the
murders and that his marijuana business came to an end after
Garrido's death. See, e.g., Jose Ventura Trial Tr. 56-59, 826-

27. The Government's comments were not burden-shifting, but the Government's permissible effort to rebut Jose Ventura's arguments.

Moreover, Jose Ventura did not raise this challenge on direct appeal, and he makes no showing that there is a reasonable probability that these statements altered the jury's verdict, see Strickland, 466 U.S. at 694, or seriously affected the fairness of the trial, see United States v. Young, 470 U.S. 1, 20 (1985).

**vi.**

Finally, Jose Ventura claims that the Government misrepresented the scope of Edwin Torrado's cooperation agreement. See ECF No. 413 at 48-50. Jose Ventura does not allege that his trial counsel provided ineffective assistance by failing to object to the Government's alleged misconduct; rather, Jose Ventura challenges the Government's conduct as a stand-alone claim. Because Jose Ventura did not raise this claim on direct appeal, the claim is procedurally forfeited, unless Jose Ventura can demonstrate cause for failing to raise the issue, and prejudice resulting from the error. See Rosario v. United States, 164 F.3d 729, 732 (2d Cir. 1999).

Jose Ventura makes no showing of either cause or prejudice in his Section 2255 petition. In any event, his claim that the Government misrepresented Edwin Torrado's cooperation agreement

40

fails on the merits. Jose Ventura alleges that the Government
repeatedly argued to the jury that Edwin Torrado had already
received all the benefits he was going to receive as a result of
his cooperation and that Torrado therefore had nothing more to
gain by testifying. See ECF No. 413 at 48-49. Jose Ventura
contends that the Government's description of Torrado's
cooperation agreement is inaccurate because Edwin Torrado was
"still on the hook for the Eugene Garrido and Carlos Penzo
murders[,]" which undermined the credibility of Torrado's
testimony. See id.

    To support this argument, Jose Ventura provides one example
of the Government's alleged mischaracterization from the
Government's rebuttal summation:

> Ask yourself whether over those years there's any incentive
> at all for him to take that risk and tell anything other
> than the truth, much less in this trial where he served his
> time, he got sentenced, the benefit for cooperating, he got
> it. He testified in another trial.
>
> He's here. He told you himself, I consider myself a free
> man, and I'm here to tell the truth.

See ECF No. 413 at 49-50 (quoting Jose Ventura Trial Tr. 838-
39). But Jose Ventura leaves out the Government's preceding
statement, that Edwin Torrado faces a substantial risk if "the
government later decides that he's not telling the truth[.]"
Jose Ventura Trial Tr. 838. The Government made clear to the
jury that Edwin Torrado "risks going to jail for the rest of his

life[]" if [Torrado] lies during Jose Ventura's trial. Id.
Moreover, as discussed above, the Government is permitted
respond to the defense's arguments during summation, see United
States v. Tocco, 135 F.3d 116, 130 (2d Cir. 1998), and Jose
Ventura's trial counsel explicitly cited Edwin Torrado's
cooperation agreement as evidence of his unreliability, see Jose
Ventura Trial Tr. 808-09, thereby opening the door to the
Government's statements in rebuttal. There was no basis to
object to the Government's statements.

### b.

Apart from Jose Ventura's allegations of prosecutorial
misconduct, Jose Ventura alleges four instances of trial
counsel's alleged failures to investigate or prepare for trial,
including: (i) counsel's failure to corroborate or present Jose
Ventura's alibi evidence, (ii) counsel's failure to review Kevin
Ventura's trial record for evidence that could be used in Jose
Ventura's trial, (iii) counsel's failure to object to the
admission of evidence regarding the Noel Montanez arson and
murder that exceeded the scope of pre-trial rulings and
prosecutors' representations; and (iv) counsel's failure to
request a multiple conspiracy jury charge.

As an initial matter, regarding Jose Ventura's (i) first
and (iii) third allegations, Jose Ventura advanced the same
argument regarding the admission of alibi evidence related to

42

the Noel Montanez arson and murder on direct appeal, see United States of America, Appellee, v. Jose Ismael Ventura, Defendant-Appellant., 2016 WL 1084927, at *19 (2d Cir. Mar. 16, 2016), and is therefore barred from relitigating this claim on collateral review, see Yick Man Mui v. United States, 614 F.3d 50, 53-54 (2d Cir. 2010). Moreover, it is undisputed that Jose Ventura was in the Dominican Republic when Eugene Garrido and Carlos Penzo were murdered. See, e.g., Jose Ventura Trial Tr. 50, 330-32, 817. But that did not stop him from planning and orchestrating those murders. Therefore, it was not ineffective assistance counsel to fail to present any other such evidence, and it would not have made a difference at trial.

Regarding Jose Ventura's (ii) second allegation that his trial counsel failed to review Kevin Ventura's trial record for evidence that could be used in Jose Ventura's trial, Jose Ventura repeats the claims he made with respect to the alleged Government misconduct. See ECF No. 413 at 27-33. Jose Ventura claims that his trial counsel failed to discover stipulations related to Detective Baquero's testimony and the rental history of the vehicles used in the murders, and then failed to use these stipulations to impeach Clara Ventura and Jorge Lafontaine. See ECF No. 413 at 52-54. But, Jose Ventura's trial counsel used his summation to impeach Clara Ventura's credibility, see Jose Ventura Trial Tr. 818-21, and to attempt

to undermine Jorge Lafontaine's testimony by claiming that he fabricated his testimony "to try to help the government convict [Jose Ventura][,]" see id. at 817-18. The decision of whether to attempt to impeach these witnesses based on stipulations used in Kevin Ventura's trial falls within the "exercise of reasonable professional judgment," See Strickland, 466 U.S. at 690; Greiner v. Wells, 417 F.3d 305, 323-34 (2d Cir. 2005); United States v. Luciano, 158 F.3d 655, 660 (2d. Cir. 1998). This evidence failed to prevent a conviction in Kevin Ventura's trial, and Jose Ventura makes no showing that he was prejudiced by his trial counsel's tactical decision not to use these stipulations in his trial.

Jose Ventura's (iv) fourth argument is that his counsel's failure to request a multiple conspiracy charge constitutes ineffective assistance of counsel. The basis of Jose Ventura's contention is that the Government presented evidence that he had been involved in several different marijuana enterprises, which Jose Ventura alleges could constitute separate conspiracies. But there is no error in failing to give a multiple conspiracies charge, as long as the evidence establishes the single conspiracy charged in the indictment, even if there is evidence of multiple conspiracies. See United States v. Vazquez, 113 F.3d 383, 386-87 (2d Cir. 1997). The failure to give a multiple conspiracies charge does not result in prejudice if "there was

44

ample proof before the jury for it to find beyond a reasonable doubt that the defendant was a member of the conspiracy charged in the indictment." United States v. Aguilar, 352 F. App'x 522, 535 (2d Cir. 2008) (quoting Vazquez, 113 F.3d at 386).

In Jose Ventura's case, the jury and the Court found that the evidence supported the conspiracy charged in the indictment, see ECF No. 352 at 4-5 (Jose Ventura Sentencing Transcript), and there is no persuasive argument that this finding was not proved beyond a reasonable doubt. Absent any showing of prejudice, Jose Ventura's claim fails. See Larkins v. Herbert, 165 F. App'x 40, 41-42 (2d Cir. 2006) (concluding that counsel's failure to object to a jury instruction did not satisfy Strickland's test when the "the charge error, if it existed, would not have made a difference in the result.").

**c.**

Jose Ventura next contends that his trial counsel failed to object to the admission of hearsay evidence. The first two instances of alleged hearsay involve Edwin Torrado's testimony. See ECF No. 413 at 59-60. The first alleged hearsay statement is Torrado's response to the question of whether Kevin Ventura "had a gun on him" the day he was arrested with Torrado. See Jose Ventura Trial Tr. 313. Torrado responded:

> Yes, he did have a gun. And my bother – when Kevin came to the spot, my brother asked him to put the gun away because there was a lot of cops driving around, so he told him to

just put it away, and he left it upstairs.

And my brother told me the same thing, but I told him I was going home.

Id. The gist of the statement is that Torrado knew from his own personal knowledge that Kevin Ventura had a gun, there was a comment from Torrado's brother, and Kevin Ventura put the gun away. The comment by Torrado's brother was not offered for the truth of what Torrado's brother asserted, and therefore was not hearsay. See Fed. R. Evid. 801(c)(2).

The second alleged hearsay statement is Torrado's statement that the detectives who questioned him on the night of his arrest took Torrado into the same room as Kevin Ventura and "asked [Torrado] if [he] recognized [Kevin Ventura]" and after Torrado said he did not know Kevin Ventura, "[the detectives] asked [him] again, so you don't know this guy[?]," Jose Ventura Trial Tr. at 317. The statements by the detectives were also not inadmissible hearsay because they were offered for the fact that the statements were made and not for the truth of the matter asserted. Moreover, there is no showing that either statement resulted in actual prejudice such that the failure to object to them constituted a violation of Strickland's prejudice prong. See Strickland, 466 U.S. at 694.

Jose Ventura further alleges that Jorge Lafontaine's statement that Cruz gave him $2,000 and said, "[t]his is from

46

Maelo," was inadmissible hearsay, and it was ineffective for
counsel not to object to its admission. See Jose Ventura Trial
Tr. 553-54, 608-09, 622-23. But these statements were admissible
as co-conspirator statements, see Fed. R. Evid. 801(d)(2)(E),
and counsel's failure to make a meritless objection to a legal
ruling does not amount to ineffective assistance of counsel.

Jose Ventura also contends that the testimony of Dr.
Corinne Ambrosi, a forensic pathologist who read from an autopsy
report about the death of Eugene Garrido prepared by another
doctor, who did not testify at trial, and the admission of that
report into evidence, violated the Confrontation Clause. See ECF
No. 413 at 60-62. This argument is without merit. Dr. Corinne
Ambrosi, the Deputy Chief Medical Examiner for Queens, testified
as an expert witness in forensic pathology. Dr. Ambrosi had
performed about 3,000 autopsies and she had testified as an
expert witness about 170 times. In the course of her testimony,
she referred to the autopsy report she prepared about the death
of Carlos Penzo. See Jose Ventura Trial Tr. 722-23. Jose Ventura
does not dispute the admissibility of Dr. Ambrosi's testimony
about the cause of Carlos Penzo's death and the admissibility of
the autopsy report Dr. Ambrosi prepared relating to Penzo's
death.

Dr. Ambrosi also testified about the cause of Eugene
Garrido's death based on, among other things, the autopsy report

prepared by another pathologist, who had left the Medical Examiner's Office, and that report was also admitted into evidence. See id. Dr. Ambrosi testified that in her expert opinion, based on all of the materials she reviewed from the Medical Examiner's files, including photographs and the autopsy report, Eugene Garrido died from a gunshot wound to the head, and Carlos Penzo died of complications from the gunshot wound to his torso. Id. 728-29, 731-32.

Defense counsel could well have argued that Dr. Ambrosi should not have been permitted to read from the autopsy report prepared by another pathologist about Eugene Garrido's death and that autopsy report should not have been admitted into evidence because the report was testimonial and therefore its admission violated the Confrontation Clause. See Garlick v. Lee, 1 F.4th 122, 136 (2d Cir. 2021). However, an expert is permitted to testify about the expert's opinions, even if the underlying facts or data are not admissible in evidence. See Fed. R. Evid. 703. Indeed, the expert can testify to the expert opinion without testifying to the underlying facts and data. See Fed. R. Evid. 705. Given Dr. Ambrosi's expert opinion as to the cause of Eugene Garrido's death based on all the information she reviewed, there is no basis to conclude that the admission of the autopsy report would have made any difference in the trial. Even putting aside the fact that Dr. Ambrosi could have

48

testified to the cause of Eugene Garrido's death, namely, a gunshot wound, the admission of the autopsy report did not prejudice Jose Ventura because the fact of the murder was understandably not contested.

Dr. Ambrosi's testimony was not relevant to determining whether Jose Ventura was involved in the murder, and Jose Ventura understandably does not contest that the murders had occurred.[7] There was substantial evidence that Jose Ventura orchestrated the murder of Garrido, including the testimony of Edwin Torrado, who had firsthand knowledge of hiring Jorge Lafontaine, who was the driver for his brother Jose Lafontaine – the shooter. See, e.g., Jose Ventura Trial Tr. 325-327. Had Jose Ventura's trial counsel made a point of the specifics of Eugene Garrrido's death, the Government could have called Jose Lafontaine to testify about his role in the shooting. Absent any showing of prejudice, Jose Ventura cannot succeed on his challenge that he received ineffective assistance of counsel based on his counsel's failure to object to the admissibility of

---

[7] Jose Ventura's trial counsel recognized the limited relevance of Dr. Ambrosi's testimony in the defense's summation, emphasizing:

Dr. Corinne Ambrosi. She testified. She told us how these men died. She couldn't tell us who did it. We know who did it, but she couldn't tell us who did it, much less why it was done. She had nothing to say about whether [Jose Ventura] had anything to do with it.

Jose Ventura Trial Tr. 800.

Garrido's autopsy report and Dr. Ambrosi's specific citations to it.

### d.

Jose Ventura claims that it was ineffective for trial counsel to have failed to interview or call three potential defense witnesses, including Arisleyda Munoz, Torrado's then-girlfriend; Jose Lafontaine, Jorge Lafontaine's brother and the shooter of Eugene Garrido and Carlos Penzo; and Jose Ventura's wife, Marisela Rodriguez. But the decision to call or not to call a witness is a strategic decision that is "ill-suited to second-guess." Greiner, 417 F.3d at 323, and "ordinarily not viewed as a lapse in professional representation." Id. (quoting United States v. Best, 219 F.3d 192, 2012 (2d Cir. 2000)).

The argument that Jose Ventura's counsel should have called these three witnesses is without merit. Regarding Torrado's then-girlfriend, Munoz, Jose Ventura alleges that the testimony from Munoz would have shown that Torrado came to her apartment and told Munoz's sister that Torrado was worried he would be accused of murder. See ECF No. 413, Ex. C, ¶¶ 2-4. Jose Ventura alleges that this testimony would have bolstered his argument that it was Torrado, and not Teresa Cruz or Kevin Ventura, who paid the Lafontaine brothers for Garrido's murder. See ECF No. 413 at 66. Relatedly, Jose Ventura alleges that his trial counsel could have relied on testimony from Jose Lafontaine to

establish that Edwin Torrado met with Jose Lafontaine's brother, Jorge Lafontaine, to provide payment after the murder, see Kevin Ventura Trial Tr. 1191.

Instead, at Jose Ventura's trial, there was testimony from Torrado that he was worried he would be blamed for Garrido's death "[b]ecause of the bad blood between [Garrido and Torrado]." Jose Ventura Trial Tr. 330-31. It was unnecessary to call Munoz for similar testimony.

Jose Ventura argues that his counsel should have called Jose Lafontaine as a witness. But calling Jose Lafontaine as a witness would have allowed the Government to underscore the details of the planning for the murder of Eugene Garrido. It would also have allowed the Government to lay out for the jury the gory details of the murder of Garrido and Penzo from the testimony of the shooter. Jose Ventura's counsel cannot be faulted for failing to call such a damaging witness.

Finally, Jose Ventura alleges that his trial counsel should have engaged Marisela Rodriguez in substantive discussions and considered whether to call her as a defense witness, based on Rodriguez's alleged presence for the conversation between Jose Ventura and his sister, Clara Ventura, on August 12, 1996. See ECF No. 413 at 65-66. In his submission, Jose Ventura attached an affidavit from Marisela Rodriguez asserting that Jose Ventura did not threaten to have Eugene Garrido killed or threaten Clara

Ventura in any way, which would have contradicted Clara
Ventura's testimony that Jose Ventura threatened the life of her
son, Garrido, during that phone call. <u>Compare</u> ECF No. 413, Ex.
B, <u>with</u> Jose Ventura Trial Tr. 645-47. But this testimony would
have been subjected to powerful cross examination that the
testimony was false in contradiction of the sworn testimony of
Clara Ventura and caused by the potential witness's obvious
prejudice as the spouse of the defendant.

All of these considerations underscore the fact that trial
counsel's decision not to call trial witnesses should rarely be
second-guessed. <u>See</u> <u>Greiner</u>, 417 F.3d at 322-23. And Jose
Ventura has not come close to establishing that the failure to
call these three witnesses rose to the level of ineffective
assistance of counsel or that their testimony would have made a
difference at trial.

**e.**

Jose Ventura alleges that his trial counsel provided
ineffective assistance because counsel failed to object to three
aspects of the jury charge: (i) the failure to include a
scienter requirement in the interstate or foreign commerce
element of the murder-for-hire charge; (ii) the applicability of
21 U.S.C. § 848(e)(1)(A) to narcotics conspiracies;[8] (iii) the

---

[8] Ventura's argument appears to be that 21 U.S.C. § 848(e)(1)(A)
– the prohibition that applies to a "continuing criminal

treatment of 21 U.S.C. § 848(e)(1)(A) as a stand-alone offense, rather than a penalty provision; and (iv) one response from the Court to a question from the jury during deliberations relating to the section 848(e)(1)(A) charge. See ECF No. 413 at 67-70.

With respect to Jose Ventura's first allegation regarding the scienter requirement, he cannot demonstrate that his trial counsel's failure to object to this jury instruction fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 688-89. As Jose Ventura acknowledged, "the case law cuts against there being a scienter requirement" for the commerce element of the murder-for-hire charge, see ECF No. 413 at 67-68, but Jose Ventura contends that the Supreme Court's decision in Rosemond v. United States, 572 U.S. 65 (2014) invalidated that case law, by holding that knowledge of every element is a condition precedent for conviction under the aiding and abetting statute. See ECF No. 413 at 67-68. But Rosemond concerned what the Government must show when it accuses a defendant of aiding or abetting a violation of Section 924(c) of Title 18, not the murder-for-hire charge at issue here. See Rosemond, 572 U.S. at 67, 71. And Jose Ventura cites no authority from the Second Circuit Court of Appeals requiring that the jury charge include

---

enterprise" - applies to the distribution of marijuana in violation of Section 841(b)(1)(A), but does not apply to drug conspiracies committed in violation of 21 U.S.C. § 846. See ECF No. 413 at 68-69.

a scienter requirement in the context of the interstate or foreign commerce element of the murder-for-hire charge.

Regarding Jose Ventura's second point, Section 848(e)(1)(A) states that "any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills . . . or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life . . .." Jose Ventura argues that "[t]he statute says nothing about offenses punishable under section 846." ECF No. 413 at 68.[9] But Section 848(e)(1)(A) of Title 21 is applicable to those engaging in offenses punishable under Section 841(b)(1)(A), which sets forth the applicable penalties for some violations for narcotics conspiracies under Section 846. See United States v. Santos, 541 F.3d 63, 65 (2d Cir. 2008)(recognizing that "some drug conspiracies in violation of 21 U.S.C. § 846 are 'punishable under' section 841(b)(1)(A)"); see also Rutledge v. United States, 517 U.S. 292, 307 (1996) ("A guilty verdict on a § 848

_____

[9] Section 846 of Title 21, entitled "attempt and conspiracy," states that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

charge necessarily includes a finding that the defendant also participated in a conspiracy violative of § 846[.]"). Furthermore, the Court instructed the jury on this distinction. See Jose Ventura Trial Tr. 882-83.

Third, relying on an order to show cause in United States v. Loera, Jose Ventura argues that Section 848(e)(1)(A) is a penalty provision, not a stand-alone offense. See ECF No. 413 at 69 (citing United States v. Loera, 09-CR-466, 2018 WL 4288623, at *1 (E.D.N.Y. Sept. 7, 2018)). But the Court in that case ultimately concluded that Section 848(e) states a substantive offense under Second Circuit precedent. See Leora, 2018 WL 4288623, at *1. There is no contrary case cited. Trial counsel's failure to object does not constitute ineffective assistance of counsel.

Finally, Jose Ventura contends that the Court's response to a question from the jury during deliberations resulted in prejudicial error. See ECF No. 413 at 69-70. The jury note sought "[c]larification on time period for element two of Count Three," which was the narcotics conspiracy that involved 1,000 kilograms or more of marijuana. See Jose Ventura Trial Tr. 1049. This question related to the Section 846 conspiracy element of Count Three, the Section 828(e)(1)(A) charge. The Court responded that, "[t]he duration of the conspiracy is a question of fact for you, the jury, to determine." Id. at 1051.

Jose Ventura contends that the Court erred in its response to the jury because the Court "should have referred the jury to the dates alleged in the indictment[,]" ECF No. 413 at 69, and that the "Court's instruction permitted the jury to consider drug weight from the previous, uncharged conspiracies[,]" id. at 69-70. But the Court read the indictment to the jury and also provided a copy to the jury and therefore the jury was aware of the time frame charged in the indictment. See Jose Ventura Trial Tr. 853. The Court also instructed the jury that

> [t]he indictment refers to various dates. I instruct you that it does not matter if the indictment provides that a specific event is alleged to have occurred on or about a certain date but the testimony indicates that in fact it was a different date. The law only requires a substantial similarly between the dates alleged in the indictment and the dates established by the evidence.

Id. 862. It is well-established that the date in the indictment need only be similar to the evidence established at trial, see United States v. Ortiz, 666 F. Supp. 2d 399, 404-05 (S.D.N.Y. 2009), and the duration of a conspiracy is a factual question for the jury, see United States v. Gregory, 611 F. Supp. 1033, 1037 (S.D.N.Y. 1985).

Finally, Jose Ventura could not have been prejudiced by the three alleged errors relating to the Section 848(e)(1)(A) charge because he was sentenced to twenty years' imprisonment on that count to be served concurrently with two sentences of life imprisonment on the counts charging murder-for-hire and

conspiracy to commit murder-for-hire, both in violation of 18
U.S.C. § 1958. See ECF No. 348.

**f.**

Jose Ventura contends that it was ineffective assistance
for his trial counsel to have failed to admit the March 5, 1996
Garrido Letter, identifying individuals that Garrido predicted
would be responsible for his death. See ECF No. 413 at 70. The
"Garrido Letter" is a letter purportedly authored by Eugene
Garrido, that was found in a search of Garrido's apartment after
his death. But, the Garrido Letter is inadmissible hearsay, see,
e.g., United States v. Gallo, No. 99-CR-1199, 2002 WL 54599, at
*1 (S.D.N.Y. Jan. 15, 2002) (statements by victim an hour after
shooting were inadmissible as dying declarations because victim
did not believe death was imminent); Fed. R. Evid. 804(b)(2),
and therefore it was not ineffective assistance of counsel for
Ventura's trial counsel not to seek to admit this evidence.
Failure to make a meritless argument does not amount to
ineffective assistance of counsel. See United States v. Arena,
180 F.3d 380, 396 (2d Cir. 1999).

**g.**

Jose Ventura contends that his appellate counsel was
ineffective on direct appeal for failing to raise the
allegations of trial counsel's alleged ineffective assistance.
See ECF No. 413 at 70-71. Jose Ventura also alleges that his

appellate counsel should have argued that (1) the evidence was
insufficient to support the pecuniary element of the murder-for-
hire charges because Jorge Lafontaine's testimony was "facially
incredible," and second (2) that the evidence was insufficient
to support the drug quantity of the section 848(e)(1)(A) charge.
Id. But Jose Ventura cannot show that failure to raise these
arguments fell below an objective standard of reasonableness, or
that he was prejudiced by appellate counsel's failure to raise
these claims.

Regarding the pecuniary element, the Court instructed the
jury that the Government had to prove beyond a reasonable doubt
that Jose Ventura "agreed to pay money or anything else of value
to have this murder carried out." Jose Ventura Trial Tr. 868.
The evidence at trial was more than sufficient to establish Jose
Ventura's guilt, and the jury rejected arguments that Jorge
Lafontaine was an unreliable witness. See id. 814-17.

Regarding the sufficiency of the evidence to support the
drug quantity, the trial evidence established that Jose
Ventura's marijuana distribution business – that had been
operating since the 1980's - would have sold over 1,000
kilograms of marijuana in over three years' time, see ECF No.
416 at 23; Jose Ventura Trial Tr. 269-70, 279-80, which was
consistent with the Court's instruction to the jury, see id. at
883, that the narcotics conspiracy must involve at least 1000

kilograms of marijuana. Given the "overwhelming" strength of the evidence, see Lafontaine, 673 F. App'x at 84, Ventura cannot show that there is a reasonable probability that, but for appellate counsel's alleged errors, the result of an appeal would have been different. See Bunkley, 68 F.3d at 1521; Abdurrahman v. Henderson, 897 F.2d 71, 74 (2d Cir. 1990).

### E. Remaining Claims by Kevin Ventura

Kevin Ventura also makes numerous claims of ineffective assistance of counsel, including that his trial counsel provided ineffective assistance of counsel with respect to both legal and factual aspects of his defense at trial, and that his appellate counsel was ineffective for failing to raise or argue certain issues on direct appeal. See ECF No. 443. None of Kevin Ventura's claims meet Strickland's standard for deficient performance, nor for prejudice. See Strickland, 466 U.S. at 687.

### 1.

Kevin Ventura contends that his trial counsel provided ineffective assistance of counsel by failing to object to the Government's alleged prosecutorial misconduct. See ECF No. 443 at 8-15. These allegations include the Government's withholding of exculpatory statements made by Teresa Cruz, the Government's withholding of travel documents that would have supported Kevin Ventura's alibi defense, and the Government's failure to correct false testimony made by Jorge Lafontaine. Kevin Ventura frames

59

his arguments both as allegations of prosecutorial misconduct, see ECF No. 443 at 9-10, and as ineffective assistance of counsel, see id. at 8.

Kevin Ventura's claims of prosecutorial misconduct and deficient performance of his trial counsel are without merit. For the reasons discussed above, Cruz's subsequent affidavits are not credible and are contradicted by the information that Cruz gave to the Government in 2013. Accordingly, Kevin Ventura's allegations that his counsel failed to object to the Government's alleged withholding of these statements are meritless.

Furthermore, Kevin Ventura – like Jose Ventura – claims that the Government withheld relevant travel documents, including Edwin Torrado's passport and a document from Customs and Border Patrol ("CBP"), corroborating Kevin Ventura's return to the United States on November 11, 1996. ECF No. 443 at 13-14, 20. But, like Jose Ventura, the fact that Kevin Ventura was in the Dominican Republic for substantial periods while the Garrido murder was carried out on August 19, 1996 was not disputed, and did not prevent his involvement in that murder. Kevin Ventura arranged to be in the Dominican Republic on the day of Garrido's murder in order to give himself and alibi. See Kevin Ventura Trial Tr. 638-41.

The Government admitted into evidence at trial Kevin

Ventura's and Edwin Torrado's passport applications, to support the Government's argument that Kevin Ventura and Edwin Torrado deliberately arranged to be out of the country on August 19, 1996, the date of Eugene Garrido's murder. See id. 640. The Government's evidence also included Torrado's testimony that he and Kevin Ventura had applied for new passports to create alibis by traveling to the Dominican Republic prior to Garrido's murder. See Kevin Ventura Trial Tr. 638-641. In his defense, Kevin Ventura introduced a passport showing that he was in the Dominican Republic from August 6, 1996 and returned to the United States on November 11, 1996. Id. 1358-62. But the Government pointed out on cross-examination that the defendant had previously claimed the passport was lost and failed to produce it. Id. at 1405. In any event, customs officials did not always stamp passports and therefore the passport was an uncertain guide as to when Kevin Ventura returned to the United States. Id. at 1406-07, 1540-41. Moreover, the Government freely admitted that Kevin Ventura left the United States before Eugene Garrido's murder to create an alibi, and the passport could not provide when Kevin Ventura actually re-entered the Untied States.

Kevin Ventura has failed to show what travel documents the Government failed to produce, or to show any prosecutorial misconduct with respect to the evidence of Kevin Ventura's

travels. Kevin Ventura had ample opportunity to convince the jury that he was not involved in the murders of Eugene Garrido and Carlos Penzo, but the jury chose to find that the Government had proven his guilt beyond a reasonable doubt. None of the defendant's travel arguments cast any doubt on that conclusion.

Finally, Kevin Ventura's allegations that Jorge Lafontaine's testimony was perjurious are unavailing. Kevin Ventura argues that Jorge Lafontaine's testimony that Kevin Ventura paid Jorge Lafontaine $4,000 approximately a week or two after the murders is false because Kevin Ventura was out of the country at the time. See Kevin Ventura Trial Tr. 965-67. But, Lafontaine testified nearly twenty years after the events at issue, and any temporal inaccuracies are understandable given the passage of time. See Dunnigan, 507 U.S. at 94-95 (1993). Jorge Lafontaine's testimony as to the fact of the payment was unequivocal, there is no basis to doubt it, and the jury could well find that Kevin Ventura's testimony that he did not return to the United States until later was not credible. Second, Kevin Ventura argues that Jorge Lafontaine's testimony that Teresa Cruz gave him $2,000 after the murder was false, based on Cruz's affidavits from 2020. But, for the reasons discussed above, these affidavits are not credible.

### 2.

Kevin Ventura next argues that his trial and appellate

counsel provided ineffective assistance of counsel by failing to argue that the evidence was insufficient to support his convictions for the use of a firearm in violation of 18 U.S.C. §§ 924(j) and (2). Kevin Ventura argues that there was insufficient evidence showing that Jose Lafontaine was a member of the marijuana distribution conspiracy that served as the predicate for the Section 924(j) convictions. Kevin Ventura also argues that there was no evidence that Jose Lafontaine intended to murder Penzo. See ECF No. 443 at 16-19. But the Government established that Jose Lafontaine himself sold marijuana at the place where Kevin Ventura sold marijuana, Kevin Ventura Trial Tr. 1091-192, that Kevin Ventura hired Jorge and Jose Lafontaine to kill Garrido "over the marijuana spot" because Kevin Ventura "wanted him out of the way," id. 1098, and there was direct evidence and testimony from Jose Lafontaine that he deliberately shot Garrido. See, e.g., id. 1105-06.

Given the strength of the evidence regarding Jose Lafontaine's membership in the conspiracy, and the intent to commit murder, Kevin Ventura's appellate counsel was not ineffective for declining to advance this argument on direct appeal. See Aparicio v. Artuz, 269 F.3d 78, 95 (2d Cir. 2001).

### 3.

Kevin Ventura contends that his trial counsel failed to investigate adequately, prepare for trial, or call a potential

witness. See ECF No. 443 at 19-23. Kevin Ventura alleges that
his trial counsel failed to investigate his travel history to
and from the Dominican Republic, and failed to investigate,
interview, and call Teresa Cruz as a witness. Id. at 19.

Regarding his travel history, Kevin Ventura again argues
that his trial counsel could have located a travel document that
showed Kevin Ventura returned to the United States on November
11, 1996 and that this document could have been used to impeach
Jorge Lafontaine's testimony that Kevin Ventura had given him a
gun a couple of days before the shooting on August 19, 1996, see
Kevin Ventura Trial Tr. 1057-58, and that Kevin Ventura paid
Jorge Lafontaine $4,000 and rented or returned the rental car
near the time of the murder, see id. 1058-61. But Kevin
Ventura's allegations do not undermine the evidence establishing
that Kevin Ventura was associated with the car rental. See,
e.g., id. 609-11. Nor do they undermine Jorge Lafontaine's
testimony. The fact that Kevin Ventura returned from the
Dominican Republic in November 1996 did not preclude him also
having returned earlier, and in any event, the difference in
time after twenty-years does not support the claim that any
additional travel records would have made any difference at
trial.

Regarding the investigation of Teresa Cruz, there would
have been no reason for defense counsel in 2013 to interview a

witness, who would provide only inculpatory evidence. The 2020 affidavits had not yet been written, and were therefore unavailable to Kevin Ventura's trial counsel. For that reason, defense counsel's decision not to call Teresa Cruz as a witness cannot be considered deficient performance. See Greiner, 417 F.3d at 323 ("counsel's decision as to whether to call specific witnesses – even ones that might offer exculpatory evidence – is ordinarily not viewed as a lapse in professional representation."). Moreover, the hearing testimony established that Teresa Cruz was not a credible witness. Because Kevin Ventura can neither demonstrate that trial counsel was ineffective, nor that Kevin Ventura suffered any prejudice, Kevin Ventura's claim of ineffective assistance of counsel fails.

**4.**

Kevin Ventura next argues that appellate counsel provided ineffective assistance when counsel failed to argue the "death resulted" issue relevant to Counts Two and Three of the indictment. See ECF No. 443 at 23. As Kevin Ventura contends, the murder-for-hire statute, 18 U.S.C. § 1958, provides for tiered penalties, with the highest penalties requiring death or life imprisonment, to be imposed only "if death results[.]" See ECF No. 443 at 23 (quoting 18 U.S.C. § 1958(a)). Kevin Ventura contended that he suffered reversable error because the jury was

not instructed specifically to find that "death resulted" as a result of Kevin Ventura's murder-for-hire scheme. But, the Second Circuit Court of Appeals considered Kevin Ventura's objection to the jury instruction on direct appeal and found any error harmless. See Ventura, 742 F. App'x at 580. And, Kevin Ventura conceded that the Second Circuit Court of Appeals applied the correct standard in affirming his conviction. See ECF No. 443 at 25 (citing Neder v. United States, 527 U.S. 1, 15 (1999)). Accordingly, Kevin Ventura's appellate counsel did not err in declining to advance an argument that is foreclosed by binding precedent. See Torres v. McGrath, 407 F. Supp. 2d 551, 562 (S.D.N.Y. 2006) ("'[f]ailure to make a meritless argument does not amount to ineffective assistance'") (quoting Arena, 180 F.3d at 396).

### 5.

Kevin Ventura contends that his trial counsel provided ineffective assistance of counsel when counsel failed to raise several objections to the jury charge. See ECF No. 443 at 27-30. Kevin Ventura alleges that (i) regarding Count One, arson is not a crime of violence for purposes of 18 U.S.C. § 924(c); (ii) regarding Counts One, Four, and Five, instructing the jury that "possession" of a firearm was sufficient for a conviction violated the Ex Post Facto Clause because at the time of the offense, 18 U.S.C. § 924(c) prohibited only the "use" or

"carrying" of a firearm; (iii) that the murder-for-hire charge required an instruction regarding the scienter requirement on the interstate or foreign commerce element; and (iv) that the firearms charges failed to instruct on aiding-abetting the murder as opposed to just the use of the firearm.

The first two arguments were addressed on direct appeal and were rejected by the Court of Appeals. See Ventura, 742 F. App'x at 577-78. Yet, Kevin Ventura alleges ineffective assistance of counsel because the Court of Appeals applied plain error review rather than harmless error review as a result of his trial counsel's failure to object to those instructions. See id. at 578; ECF No. 443 at 27. The Court of Appeals also rejected the fourth argument.

**a.**

Turning to Ventura's first claim regarding the jury charge, in addition to arson, Count One also alleged conspiracy to distribute marijuana as a predicate offense for the Section 924(j) murder charge involving the killing of Montanez through the use of a firearm. In affirming Kevin Ventura's conviction, the Second Circuit Court of Appeals explained: "To convict Ventura, the jury only needed to find that Ventura committed one (or both) of these predicate crimes." See Ventura, 742 F. App'x at 578. At trial, Kevin Ventura admitted to engaging in drug trafficking, see, e.g., Kevin Ventura Trial Tr. 1497, and the

67

jury's questions during deliberation indicate that the jury
believed that trafficking served as the predicate for Count One,
rather than arson, see id. 1661. For this reason, the Court of
Appeals concluded that "any error . . . would not have affected
Ventura's substantial rights, because he has not pointed to any
error that would have led the jury to a different verdict on
Count One[,]" Ventura, 742 F. App'x at 578, and therefore, that
Kevin Ventura failed to meet the plain error standard, id.

Because Kevin Ventura's objection to the jury instruction
did not survive plain error review, his claim of ineffective
assistance of counsel cannot prevail. Under the plain error
standard of review, "an error, even if clear or obvious, must
affect substantial rights, which normally means the error must
have been prejudicial: It must have affected the outcome of the
district court proceedings." Bennett, 663 F.3d at 88-89 (quoting
United States v. Olano, 507 U.S. 725, 734 (1993)). Because the
jury instruction for Count One was found not to have affected
the outcome of the trial before the district court, there is no
basis to conclude that there is any reasonable probability that,
had there been objections, the jury would not have found Kevin
Ventura guilty. See, e.g., Bennet, 663 F.3d at 88-89 (finding
that the defendant's ineffective assistance of counsel claim
failed when the objection could not be sustained under plain
error review). Therefore, Kevin Ventura cannot show that the

failures to object satisfy the prejudice prong of the Strickland

test. See Strickland, 466 U.S. at 694.

**b.**

Regarding Kevin Ventura's Ex Post Facto claim, the Second

Circuit Court of Appeals likewise addressed this issue,

reasoning:

> [V]acatur is not warranted. On each Section 924(j) charge,
> the jury convicted based on a violation of 924(c) resulting
> in the death of a unique victim. Each victim was shot to
> death. There is no possibility that Ventura was convicted
> for mere possession of a firearm: the firearm was used to
> shoot the victims to death. Accordingly, there was error,
> but, even assuming the error was plain, there is no basis
> to remand because "there is no reasonable probability that
> the jury would have acquitted [Ventura] absent the error."

Ventura, 742 F. App'x at 578 (quoting United States v. Marcus,

628 F.3d 36, 42 (2d Cir. 2010)). As discussed above, the

decision by the Court of Appeals makes clear that there was no

reasonable probability that the result of the trial would have

been different if Kevin Ventura's counsel had argued that the

jury instructions for Counts One, Four, and Five violated the Ex

Post Facto Clause. See Strickland, 466 U.S. at 694.

**c.**

Regarding Kevin Ventura's claim based on the scienter

instruction, Kevin Ventura concedes that his claim is made

"simply as a preservation matter," see ECF No. 443 at 27, and

cites no precedent to support the proposition that a murder-for-

hire charge requires a scienter instruction on the interstate commerce element. Nor does Kevin Ventura explain why his counsel rendered deficient performance for failing to make this claim.

**d.**

Kevin Ventura contends that his trial counsel provided ineffective assistance when he failed to object to the aiding-and-abetting charge. See ECF No. 443 at 28. Specifically, Kevin Ventura alleges that the instruction permits a defendant's conviction of a Section 924(j) offense without requiring proof that the defendant must have intended the murders to result from the use of a firearm in the furtherance of a drug conspiracy. See Rosemond, 572 U.S. at 78 (recognizing that in order to aid and abet a Section 924(c) offense, a defendant must have "advance knowledge" of "a confederate's design to carry a gun.").

In this case, the jury instructions required the jury to "find that the defendant performed some act that facilitated or encouraged the actual using, carrying of, or possession of the firearm in relation to one or both of the predicate crimes." See Kevin Ventura Trial Tr. 1589. And, the Second Circuit Court of Appeals found that this instruction satisfied the requirements of Rosemond, because "[i]t is difficult to see how a defendant might accomplish this without advance notice that a gun would be used." See Ventura, 742 F. App'x at 579. The Court of Appeals

reasoned:

> On Counts Four and Five, [Kevin] Ventura was out of the country when the murders took place, and thus his only possible facilitation or encouragement of the use or carry of the gun was in advance of the crime. With regard to Count One, the evidence tended to establish that Ventura planned to burn down a store, and that he and his accomplice were both armed when they carried out this plan. Further, the evidence indicated that Ventura lit the fire after his accomplice shot the clerk. Accordingly, at a minimum, the evidence showed that "after the gun appeared, [Ventura] continued to play an active role in the crime," United States v. Prado, 815 F.3d 93, 105 (2d Cir. 2016), thereby satisfying the requirements of Rosemond.

See Ventura, 742 F. App'x at 579.

**e.**

Finally, Kevin Ventura contends that his trial and appellate counsel failed to advance a statute of limitations argument with respect to all counts of the indictment. See ECF No. 443 at 30-32. Regarding Counts One, Four, and Five – the firearm counts – Kevin Ventura recognizes that no statute of limitations applies to a capital offense under Section 924(j). See ECF No. 443 at 30; see Rodriguez v. United States, 679 F. App'x 41, 43 (2d Cir. 2017) (summary order). However, Kevin Ventura argues that because the underlying narcotics conspiracy was time barred, there is no valid underlying predicate. But, courts in this Circuit have repeatedly held that the statute of limitations defense does not apply to a capital offense like a Section 924(j) charge, even when there is a valid statute of

limitations defense to the underlying predicate. <u>See</u> <u>Valerio v.</u>
<u>United States</u>, No. 15-CV-1045, 2016 WL 354894, at *2 (S.D.N.Y.
Jan. 28, 2016); <u>United States v. Dames</u>, No. 04-CR-1247, 2007 WL
1032257, at *1 (S.D.N.Y. Mar. 30, 2007).

For Counts Two and Three – the murder-for-hire counts –
Section 1958(a) charges a capital offense and is likewise not
subject to a statute of limitations defense. <u>See</u> 18 U.S.C. §
3281; <u>see</u> <u>Knight v. United States</u>, 576 F. App'x 4, 5 (2d Cir.
2014) (summary order). Accordingly, Kevin Ventura's trial
counsel did not provide ineffective assistance by determining
not to move to dismiss these counts on statute-of-limitations
grounds, and appellate counsel did not provide ineffective
assistance by failing to raise the issue.

## CONCLUSION

The Court has carefully considered all of the parties'
arguments. To the extent they are not dealt with above, they are
either moot or without merit. For the reasons explained above,
the petitioners' motions to vacate, set aside, or correct their
sentences pursuant to 28 U.S.C. § 2255 are **denied.** The petitions
are therefore dismissed. Because the petitioners failed to make
a substantial showing of the denial of a constitutional right,
the Court declines to issue a certificate of appealability
pursuant to 28 U.S.C. § 2253(c). The Court declines to find good
cause for the defendant to proceed <u>in forma pauperis</u> on appeal.

<u>See</u> 28 U.S.C. § 1915.

The Clerk is directed to enter this Memorandum Opinion & Order in Nos. 18-cv-9179, 20-cv-8064, and 09-cr-1015. The Clerk is directed to close all pending motions in Nos. 18-cv-9179 and 20-cv-8064 and to close those cases. The Clerk is directed to close ECF Nos. 382, 417, 420, 422, 431, and 441 in No. 09-cr-1015.

**SO ORDERED.**

**Dated:**   **New York, New York**
        **May 1, 2024**

                                        John G. Koeltl
                                United States District Judge